IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REGGIE COLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 02 C 9246 |
| ) | |
| THE CITY OF CHICAGO, ) | Magistrate Judge Schenkier |
| a municipal corporation, TIMOTHY ) | |
| THOMAS, MAXINE THOMAS ) | |
| JACKSON, d/b/a ROSE COCKTAIL ) | |
| LOUNGE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER[1]

This lawsuit arises out of an altercation at the Rose Cocktail Lounge on the night of December 31, 2001 and/or the early morning hours of January 1, 2002. Plaintiff, Reggie Coles, claims that during that altercation, he was shot in the mouth by defendant Timothy Thomas, an off-duty police officer. In his third amended complaint, Mr. Coles asserts claims: (a) against Mr. Thomas under 42 U.S.C. § 1983 (Count II), and on state law theories of negligence (Count III), assault (Count V), and battery (Count IV); (b) against Maxine Thomas Jackson, d/b/a Rose Cocktail Lounge for negligence (Count III); and (c) against the City of Chicago, for any damages that Mr. Coles may recover against Mr. Thomas on the Section 1983 claim (Count II).[2]

---

[1] By the parties' consent, on November 4, 2003, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), for this Court to conduct any and all proceedings in this case, and to enter final judgment (doc. #s 28-32).

[2] Count I is something of a mystery: it is directed toward Mr. Thomas and the City, but does not identify what cause of action is being asserted. However, since the current motions are not directed to Count I, we will defer explanation of that mystery for another day.

The City has moved for summary judgment on Count II (doc. # 60), on two grounds. *First*, the City argues that there is nothing to indemnify on the Section 1983 claim, as the undisputed material facts show that Mr. Coles was not shot and that Mr. Thomas was not acting under color of law during their encounter. *Second*, the City argues that, in any event, plaintiff has no claim against the City for indemnity because the undisputed material facts show that Mr. Thomas was not acting within the scope of his employment during his encounter with Mr. Coles. Ms. Jackson has moved to join the City's motion (doc. # 61), insofar as the City argues that no shooting occurred.

We grant Ms. Jackson's motion to join in the City's summary judgment motions. However, for the reasons set forth below, the City's motion is denied.

### I.

We begin the discussion with the legal standards that govern summary judgment motions, which are well-established. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to Local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.*, affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598.

## II.

The City seeks summary judgment by asserting that certain facts material to resolution of Count II are without genuine dispute.[3] We begin by setting forth, in Section II. A., *infra*, the material facts we find to be undisputed. However, many of the material facts are genuinely disputed by the parties. We will identify those disputed facts in Section II. B., *infra*.

---

[3] The City has filed a "Corrected Local Rule 56.1(a)(3) Statement of Uncontested Facts" ("Def.'s 56.1 C. St.") to show that certain statements are allegations of the plaintiff and not assertions of uncontested fact; for example, statements 8 and 10. The Court accepts the Corrected Statement because it simply adds the word "alleged" to various paragraphs and therefore is consistent with the remainder of the defendant's fact assertions, which allege that Mr. Thomas did not shoot the plaintiff. Mr. Coles, the plaintiff, did not request leave to respond to the Corrected Statement; therefore, the Court will accept Mr. Coles's responses to the original Local Rule 56.1 Statement submitted by the City as applying to the Corrected Statement, as well.

## A.

On the night of December 31, 2001, and the early morning of January 1, 2002, Mr. Coles and Mr. Thomas were both at the Rose Cocktail Lounge (also referred to herein as the "nightclub"). Mr. Thomas was employed as a police officer of the City of Chicago (Def.'s 56.1 C. St. ¶ 13), and was off-duty (*Id.* ¶ 14).

Shortly after midnight, a fight broke out among some of the patrons – first at the back of the nightclub (the "initial disturbance"), and then at the front entrance to the nightclub (the "fight") (Def.'s 56.1 C. St. ¶¶ 5-6, 20-21). Both Mr. Coles and Mr. Thomas, for different reasons and from different places in the nightclub, walked to the front entrance, toward the fight. Mr. Thomas was not wearing a police uniform or a police badge of any kind, but rather was dressed in plain clothes (Def.'s 56.1 C. St. ¶¶ 16, 35). Mr. Coles has testified that he heard the person who injured him at the front entrance shout, "police, police, police!" (Def.'s 56.1 C. St. ¶ 8; Def.'s Ex. B, Coles Dep. at 64-71). For his part, Mr. Thomas has testified that he shouted to the crowd at the front door that he was the police "at least once" (Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 72), for the purpose of establishing his authority to tell the patrons to "get out of" and/or to "get [the fight] out of" the club (*Id.*, Thomas Dep. at 70-71). The General Orders of the Chicago Police Department require an off-duty officer to take some action when he observes a crime being committed (Def.'s 56.1 C. St. ¶ 60).

The parties agree that an altercation took place. And, although they disagree about precisely what happened during that altercation, they agree that a 911 call was made from the nightclub. The individual making that call, Sonya Remus, told the telephone dispatcher that shots had been fired inside the lounge, that three women were stabbed and one man was shot, and that everyone was running for cover (Pl.'s 56.1 Add'l Facts ¶¶ 9-10).

Thereafter, Mr. Coles was taken to the Loretto Hospital emergency room, where it was documented that he had active bleeding from the mouth (Pl.'s Ex. 1, Loretto Hospital Emergency Treatment Record at 1, 3).[4] A man named "Dorsey" made a 911 call from Loretto Hospital to report a possible gun shot victim who was unable to give any information. Mr. Dorsey further reported that "someone . . . came in with him but ran out of the building before [they] could get any information from him" (Pl.'s Ex. 3, Bates No. 000134). A CT Scan conducted by Dr. P. Sevilla revealed a large bullet fragment embedded on the left side of Coles's cervical spine (Pl.'s 56.1(b)(3)(b) Add'l Facts, ¶ 7, Pl.'s Ex. 1). In 1999, Mr. Coles had been shot in the back by his upper, left shoulder. Mr. Coles was taken to Cook County Hospital ("CCH") for treatment of that gunshot wound; no one at CCH told Mr. Coles he had retained a bullet in his neck (Def.'s 56.1 C. St. ¶¶ 49-52).

Later on January 1, 2002, Mr. Coles was transferred from Loretto Hospital to Mount Sinai Hospital for treatment (Def.'s 56.1 C. St. ¶¶ 40-41). A female named "Carey" made a 911 call from Mount Sinai Hospital (Pl.'s Ex. 3, Bates No. 000121). Ms. Carey reported that Mr. Coles had been shot at the Rose Cocktail Lounge by a bouncer (Id.). Ms. Carey further reported that the bouncer fired shots in the nightclub (Id.).

### B.

There are two main areas of factual dispute material to the claims at issue: (1) what happened between Mr. Coles and Mr. Thomas after they reached the front of the nightclub; and (2) what the evidence shows regarding Mr. Coles's alleged injuries.

---

[4] Mr. Coles asserts that he was actively bleeding from his mouth at the time of his arrival at Loretto Hospital (Pl.'s 56.1(b)(3)(b) Add'l Facts ¶ 3). The City purports to dispute this fact, but fails to provide any supporting record citation or other evidentiary support (see Def.'s Add'l Facts Resp. ¶ 3). Pursuant to Local Rule 56.1, we therefore deem plaintiff's assertion admitted.

## 1.

Mr. Coles claims that during the altercation at the nightclub in the early morning hours of January 1, 2002, Mr. Thomas shot him at point blank range after first shouting "police, police, police!" (Def.'s 56.1 C. St., Ex. B, Coles Dep. at 64-71, 78-79). Mr. Coles claims that Mr. Thomas did this within the scope of his employment as a police officer. Conversely, the City claims that Mr. Thomas did not shoot Mr. Coles (Def.'s 56.1 C. St. ¶¶ 27, 53); and that while Mr. Thomas "perhaps" announced his office "once" (*Id.*, ¶ 37), he was not acting as a police officer or within the scope of his employment at any time during the incidents in question. We find a number of genuine, material fact disputes on these points, which we summarize below.

*First,* the parties do not dispute that Mr. Thomas announced himself as a police officer to the fighting crowd. The dispute appears to center on the manner, frequency, and purpose of the announcement. That dispute is relevant to the questions of color of state law, and scope of employment.

*Second*, Mr. Coles points out that Mr. Thomas has admitted that he assisted another security guard to restore peace inside the nightclub when the fight at the front door of the club broke out (Pl.'s 56.1(b)(3)(b) Add'l Facts ¶ 20). The City's principle response is to emphasize all the things that Mr. Thomas allegedly did not do: he did not aid the security guards in removing any of the patrons from the nightclub (Def.'s 56.1 C. St. ¶ 29); he "did not attempt to break up the fight at the front of the nightclub (Def.'s 56.1 C. St. ¶ 31); he did not call 911 from his cell phone (Def.'s 56.1 C. St. ¶ 32); he did not restrain the person who allegedly hit him (Def.'s 56.1 C. St. ¶ 33); he did not arrest anyone or attempt to arrest anyone that evening (Def.'s 56.1 C. St. ¶ 34); he never showed his badge to anyone other than to the responding officers who arrived at the nightclub after the fight had

occurred (Def.'s 56.1 C. St. ¶ 35); and, he did not investigate the crime that occurred in the nightclub that evening (Def.'s 56.1 C. St. ¶ 36). The City also denies that Mr. Thomas was working as a security guard at the time of the fight (Def.'s 56.1(b)(3)(b) Add'l Facts Resp. ¶ 20). However, none of that evidence directly refutes Mr. Thomas's deposition testimony that he assisted security in restoring peace (*Id.*). These factual issues bear on the purpose for Mr. Thomas's actions, which is relevant to both color of the state law and scope of employment.

*Third*, there is a disputed issue whether Mr. Thomas had a gun in his right hand when he moved toward the fighting crowd, and whether he used it to shoot Mr. Coles. The dispute is based on contradictory sworn testimony by Mr. Coles and Mr. Thomas about whether Mr. Thomas had a gun in his hand (or whether it was locked behind the bar at the nightclub), and whether he in fact used it. In addition, the record discloses contradictory statements by a witness, Patrick Hunter, on this point. On the day of the incident, Mr. Hunter told an investigating officer that he saw a police officer from the 15th district named "Tim," who worked at the nightclub as a bouncer, with a gun in his hand during the altercation. Mr. Hunter also said he heard gunshots and "knew his friend [Mr. Coles] was shot (Pl.'s 56.1(b)(3)(b) Add'l Facts ¶¶ 15-16; Pl.'s Ex. 3, at 00022-23). Ten months later, Mr. Hunter told another officer that he saw a black male, who others told him was "Tim," holding an unidentified object in his right hand, and telling people to get back. Mr. Hunter said he then fell, heard a loud slapping noise, and then saw Mr. Coles holding his mouth. But, Mr. Hunter said he never saw a gun or saw anyone shoot at Mr. Coles (*Id.*, Pl.'s Ex. 3 at 00011). This disputed factual record about Mr. Thomas's possession and use of a gun are material to the question of whether Mr. Thomas in fact violated Mr. Coles's rights.

7

**2.**

We turn now to the disputed medical evidence. Mr. Coles also asserts that the treating physician at Loretto Hospital diagnosed his injury as "gunshot wounds to the mouth and neck" (Pl.'s 56.1(b)(3)(b) Add'l Facts ¶ 2). The City claims that the diagnosis did not indicate multiple gunshot wounds, but instead only stated that Mr. Coles had a "gunshot wound." But, that "dispute" centers on the number of wounds Mr. Coles may have suffered, and does not create an undisputed factual record showing that Mr. Coles was not shot at all.

The City also disputes that the medical evidence shows that plaintiff received this wound on January 1, 2002 (Def.'s 56.1(b)(3)(b) Add'l Facts Resp. ¶ 2, n.1). However, the Loretto Hospital medical report in question (the emergency treatment record) states that Mr. Coles presented himself as "self-ambulating with active bleeding from possible GSW to L side of mouth . . . Pt. x-ray . . . for GSW in L neck, no airway or spinal compromise noted" (Pl.'s 56.1(b)(3)(b) Add'l Facts, Ex. 1). The Loretto Hospital reports in no way create an undisputed factual record of the absence of a gunshot wound.

The medical records from Mount Sinai Hospital are consistent with the Loretto Hospital records. For example, Dr. Wise, the attending trauma surgeon at Mount Sinai Hospital, testified in his deposition that the "Trauma Evaluation History & Physical" consult report indicates that Mr. Coles had been shot in the face once at close range (Pl.'s 56.1(b)(3)(b) Add'l Facts, Ex. 2). In his deposition, Dr. Wise conceded that this information may have come from Mr. Coles; but, he also concluded that medical observation and examination revealed that there was a bullet entrance wound on the left side of the cheek and/or mouth that knocked out the left incisor tooth (Def.'s 56.1 C. St., Ex. C, Wise Dep. at 29). Dr. Wise further noted that there was no evidence of an exit wound, and

no evidence "whether he spit the bullet out or whether it entered any other body cavity" (*Id.*, at 30). On that point, Dr. Wise further testified as follows:

> **Q:** ...would a bullet striking someone with enough force to knock out their tooth not penetrate into their mouth to some degree?
>
> **A:** It did penetrate the mouth. It went through the anterior portion of the face at the level of the cheek causing injury to the tooth and then following that, it may not have penetrated any further.
>
> **Q:** It could have expended all of its force in getting through the tissue to the tooth and then knocking out the tooth without going any further into the person's body?
>
> **A:** That's conceivable.

(Def.'s 56.1 C. St., Ex. C, Wise Dep. at 30).

In the face of this evidence that Mr. Coles in fact suffered a gunshot wound to the mouth on January 1, 2002, the City points to Dr. Wise's testimony that "if the history" given to him and/or the resident about Mr. Coles being shot in the mouth were "inaccurate or wrong," then it was "conceivable" that "there could be another explanation for the avulsed tooth" (Def's. 56.1 C. St., Ex. C, Wise Dep. at 49). The City then attempts to convert this "conceivability" into a certainty, and argues that Dr. Wise's testimony constitutes undisputed fact that Mr. Coles was not shot. In so doing, the City ignores the other medical evidence we have recited, as well as the following additional testimony of Dr. Wise:

> **Q:** ...based on your examination of the wound, which you pointed out from the photographs that [were] shown to you, when you say: that's where I recall the bullet entered his mouth, do you recall that?
>
> **A:** I recall showing you a wound that I thought at the time I saw him was a gunshot wound.

9

> **Q**: And do you have any evidence whatsoever that suggest[s] to you that the wound is not consistent with a gunshot wound?
>
> **A**: No.

(*Id.*). Contrary to the City's assertion, the medical evidence does not create an undisputed factual record showing that Mr. Coles was not shot by Mr. Thomas.

### III.

Having identified the genuinely disputed issues of material fact, the Court turns to the substantive legal standards that make these disputed facts material, and that govern resolution of the City's motion.

In Count II, Mr. Coles alleges that Mr. Thomas deprived him of his Fourth and Fourteenth Amendment rights to be secure in his person against unreasonable seizure; not to be deprived of life, liberty or property without due process of law; and to be accorded equal protection of the laws (Th. Am. Compl. ¶ 16). Mr. Coles alleges that the deprivation of these rights violated Section 1983, causing him damage (*Id.*, ¶¶17-18). To establish Mr. Thomas's liability under Section 1983, Mr. Coles must show: (1) that Mr. Thomas deprived Mr. Coles of a right secured by the Constitution and laws of the United States, and (2) that Mr. Thomas acted under color of state law when he did so. *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995); *Lyons v. Adams*, 257 F. Supp.2d 1125, 1131 (N.D. Ill. 2003).

Count II does not assert a claim directly against the City based on *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). While Mr. Coles originally asserted a *Monell* claim, he dropped that claim from his second amended complaint, and the Court denied his motion to reinject that claim into the case in his third amended complaint (*see* doc. # 50). Rather, Mr. Coles's

claim against the City in Count II seeks to hold the City responsible to indemnify Mr. Thomas for compensatory damages that may be awarded against him on the Section 1983 claim.[5]

Thus, in order for Mr. Coles to establish the City's responsibility for indemnity on Count II, he must establish: (1) his Section 1983 claim against Mr. Thomas, by showing that Mr. Thomas wrongfully deprived him of a protected right, while acting under color of state law, *see Pickrel*, 45 F.3d at 1118; and (2) that Mr. Thomas was acting within the scope of his employment at the time of the wrongful conduct. *See Coleman v. Smith*, 814 F.2d 1142, 1147 (7th Cir. 1987). The two elements of "under color" and "scope of employment" should not be confused. The under color requirement is necessary for liability against the individual officer; the scope of employment requirement is necessary to hold the City that employs this officer responsible under Section 10/9-102. *Coleman*, 814 F.2d at 1149.

We now turn to an analysis of each element necessary to an indemnity claim against the City, which reveals genuinely disputed material facts on each element.

---

[5]Illinois law authorizes this kind of indemnity. *See* 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article"). Although plaintiff does not cite this statutory provision in his complaint, we are comfortable that this is what he intends: (a) plaintiff cites Section 10/9-102 in his summary judgment papers (*see* Pl.'s Mem. at 6 n.5), and (b) this also is how the City interprets Count II, as reflected by the fact that the City cites Section 10/9-102 in its summary judgment papers (*see* Def.'s Mem. at 6 and n. 6), and argues the facts and case law relevant to whether Section 10/9-102 applies (*Id.*, at 6-12).

There is no doubt that a judgment under Section 1983 constitutes a "tort" judgment for purposes of Section 10/9-102. *See Kolar v. Sangaman County*, 756 F.2d 564, 566 (7th Cir. 1985). Moreover, we note that it is common, and indeed advisable, for a plaintiff who expects a public entity to indemnify a Section 1983 judgment to add that entity as a defendant on the indemnity claim during the pendency of the Section 1983 case. *See Wilson v. City of Chicago*, 120 F.3d 681, 684 (7th Cir. 1997); *Tibbs v. City of Chicago*, No. 02 C 2970, 2003 WL 288946, * 2 (N.D. Ill. Feb. 10, 2003).

## A.

We begin with the question of whether there is a genuine dispute as to whether Mr. Coles was "deprived of a right," which turns on the issue of whether there is a factual dispute as to whether Mr. Thomas shot him. As our discussion of the facts reveals, plainly there is. There is disputed evidence as to whether Mr. Thomas had a gun in his hand, and disputed evidence as to whether Mr. Thomas discharged a weapon. Apart from the statements of the protagonists here (Mr. Coles and Mr. Thomas), there is evidence of a contemporaneous 911 report from the nightclub stating that shots were fired and a man was wounded. In addition, there is evidence that shortly after the incident, Mr. Hunter made a statement to an investigating officer that he saw a police officer by the name of "Tim," who was working as a bouncer at the nightclub, carrying a gun at the time of the incident, and that he heard gunshots "and then knew that his friend [Mr. Coles] was shot" (Pl.'s Ex. 3, Bates No. 000023). The fact that Mr. Hunter told a different story to a different investigator ten months later does not empower us, on summary judgment, to choose one version over another. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000).

The medical evidence further creates, at a minimum, a dispute as to whether Mr. Coles was shot at the nightclub. The contemporaneous medical records state that Mr. Coles was shot. While one of the treating emergency room physicians, Dr. Wise, later testified that it was "conceivable" that there might have been another explanation for Mr. Coles's injury, Dr. Wise also testified that what he thought he saw in the early morning hours of January 1, 2002 was a gun shot wound, and that he had no evidence that the wound he saw was not consistent with a gun shot wound.

The evidentiary record submitted to the Court therefore falls far short of establishing that, as a matter of undisputed fact, Mr. Coles was not shot on or about January 1, 2002 at the nightclub, or that Mr. Thomas did not do the shooting.

**B.**

We next turn to the question of whether the undisputed material facts show that Mr. Thomas was not acting under color of law during any encounter he had with Mr. Coles at the nightclub. Throughout this opinion, we have referred to Mr. Thomas without using his official title for a reason: we do not wish to have been thought to prejudge the question of whether Mr. Thomas, who was indisputably "off-duty" at the time of Mr. Coles's alleged injury, acted "under color of law."

The question of whether Mr. Thomas acted under color of law is a highly fact specific inquiry that is not susceptible to an easy, formulaic analysis. In considering the factors relevant to that inquiry, we find helpful the treatment of this question in *Lyons v. Adams*, 257 F. Supp. 2d 1125 (N.D. Ill. 2003) which we quote at length:

> Traditionally, the courts have held that a defendant acts under the color of state law when he exercises power "'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Thomas v. Pearl*, 998 F.2d 447, 450 (7th Cir. 1993) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). Thus, government employees who act in their official capacity or exercise their responsibilities pursuant to state law act under color of state law. *See Hill v. Barbour*, 787 F.Supp. 146, 149 (N.D. Ill. 1992). Conversely, government employees who act without the cloth of state authority do not subject themselves to liability under Section 1983. *See Hughes*, 880 F.2d at 971.
>
> Although most police officers are state officials for purposes of Section 1983, the mere fact that the defendant is a police officer does not mean that the defendant acted under color of state law. *Gibson v. City of Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990). Indeed, the Supreme Court has observed that "acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws v. United States*, 325 U.S. 91, 111 (1945). On the other hand, "[a]cts of officers who undertake to perform their

official duties are included whether they hew to the line of their authority or overstep it." *Id.* at 111.

Notably, the Supreme Court has stated that "under color of state law" also means under "pretense" of state law. *See Screws,* 325 U.S. at 111. Thus, a police officer who purports to exercise official authority to further private interests is generally considered to be acting under color of state law. *See Barna v. City of Perth Amboy* 42 F.3d 809, 816 (3rd Cir. 1994).

As Judge Conlon has noted, no bright line distinguishes a police officer's personal pursuits from actions taken under color of state law. *Kindred v. Hilt-Dyson,* No. 94 C 4377, 1995 WL 250417, at * 3 (N.D. Ill. April 25, 1995) (citing *Pitchell v. Callan,* 13 F.3d 545, 548 (2d Cir. 1994). Thus, the question whether a police officer acted under color of state law is not answered by whether the officer was on or off duty at the time. *See, e.g., Klein v. Vanek,* No. 96 C 5834, 1999 WL 966968, at * 2 (N.D. Ill. Oct. 5, 1999). Further, the accouterments of state authority, such as the police uniform, patrol car, badge or gun, are not dispositive. *See, e.g., Butler v. Corral,* No. 98 C 802, 1999 WL 1069246, at * 3 (N.D. Ill. Nov. 22, 1999).

Instead, the essential inquiry is whether the police officer's actions related in some way to the performance of a police duty. *Gibson,* 910 F.2d at 1517. *See also Pickerel v. City of Springfield,* 45 F.3d 1115, 1118 (7th Cir. 1995) ("[T]he specific nature of the acts performed must be considered and their relationship to the officer's performance of his or her official duties"); *Treiber v. Rompala,* No. 01 C 5049, 2002 WL 1467673, at * 3 (N.D.Ill. July 9, 2002) ("Even acts committed while a police officer is on duty are not committed under color of state law unless they are in some way related to the performance of police duties") (citations and quotations omitted). Judge Coar's . . . opinion in *Zienciuk v. City of Chicago,* No. 01 C 3769, 2002 WL 1998309 (N.D.Ill. Aug. 28, 2002), is instructive on the under color of state law issue. In *Zienciuk,* Judge Coar granted summary judgment in favor of two off duty Chicago police officers, holding that they did not act under color [of] state law when they engaged in a bar fight prompted by an alleged derogatory racial remark. 2002 WL 1998309, at * 5. Judge Coar noted that "[n]ot only were [the defendants] off-duty, but they were not wearing police uniforms and they did not identify themselves to [the plaintiff] as police officers when they initially approached him." *Id.* Further, neither officer "asserted their police authority over [the plaintiff] by arresting him, and they behaved the same way non-police officers would behave after they got into a brawl." *Id.* at * 6. Because the case involved "a bar fight, plain and simple," Judge Coar concluded that the two officers did not act under color of state law. *Id. See also Latuszkin v. City of Chicago,* 250 F.3d 502, 506 (7th Cir. 2001) (upholding dismissal of Section 1983 claims against off duty police officer where the plaintiff failed to allege that the officer "was engaged in any police activity, that he displayed any police power, or that he possessed any indicia of his office").

*Lyons*, 257 F. Supp.2d at 1131-1132. Applying this analysis, the disputed facts of this case give rise to a triable issue on the under color of state law element.

Unlike the case in *Zienciuk v. City of Chicago*, No. 01 C 3769, 2002 WL 1998309, * 6 (N.D. Ill. Aug. 28, 2002), we do not think that the undisputed facts here show that the actions allegedly taken by Mr. Thomas amounted to "a bar fight, plain and simple." Mr. Thomas announced his presence as a police officer – "at least once" according to his own testimony (Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 72), and three times according the Mr. Coles's testimony (Def.'s 56.1 C. St., Ex. B, Coles Dep. at 64-71). The record here indicates that, unlike the case in *Zienciuk*, Mr. Thomas did so *before* he began to take the actions Mr. Coles alleges as the deprivation of his constitutional rights (*i.e.*, *before* he allegedly raised his gun and shot him at close range in the face). And, there is evidence that the alleged shooting occurred immediately after Mr. Thomas shouted "police, police, police!" (Def.'s 56.1 C. St., Ex. B., Coles Dep. at 72).

Moreover, Mr. Thomas has testified that while he was at the front door, and after he notified the crowd that he was a police officer, he assisted the security guards who were present in trying to restore the peace among the fighting patrons. Mr. Thomas's testimony indicates that as he entered the fighting crowd he announced his presence as a police officer and told the crowd to "get out of" the nightclub (Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 71). Mr. Thomas also says that he directed his mother to call the police before he entered the crowd (*Id.*, at 46).

To be sure, the undisputed facts show that Mr. Thomas was off-duty and he did not wear a uniform that night; nor did he carry or show the crowd a badge. Although such "accouterments of state authority . . . are not dispositive," *Lyons*, 257 F. Supp. 2d at 1132, they are factors a jury may consider in determining whether Mr. Thomas was acting under color of law. At the same time,

according to Mr. Thomas, his actions satisfied the General Orders of the Chicago Police Department to take "some action when he observes a crime being committed" (Def.'s 56.1 C. St. ¶ 60; Ex. D, Thomas Dep. at 44-45). And, Mr. Thomas has testified that when he is fulfilling this duty to take "some action" in response to a crime, then he is taking "police action" which means he is "doing police work" (Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 45).

This disputed factual record is significantly different from the record presented in *Zienciuk*. There, the off-duty police officers began to strike the plaintiff well before they told the plaintiff they were police officers. In addition, the way in which the officers in *Zienciuk* revealed their police officer status might suggest an intent different than Mr. Thomas's intent here. In *Zienciuk*, the off-duty officers revealed their status to the plaintiff, not for the purpose of motivating or ordering him to act or refrain from acting in a way that potentially violated a criminal law, but rather as a jeer in response to the plaintiff's assertion that someone should call the police. By contrast, the record here could support the inference that Mr. Thomas made an announcement of his office that was not directed to plaintiff alone, and that was motivated (at least in part) by a desire to perform the police duties of breaking up the fighting crowd, and restoring peace.

This record does not allow the Court to make that determination on summary judgment. Accordingly, the Court concludes that there is a triable issue on whether Mr. Thomas acted under color of law.

### C.

Because this motion is brought by the City, there is one more issue to discuss. As stated, the City can be held liable for indemnity under Section 10/9-102 only if Mr. Thomas's alleged actions fell within the scope of his employment as a City of Chicago police officer.

16

In *Pyne v. Witmer*, 543 N.E.2d 1304 (Ill. 1989), the Illinois Supreme Court noted that while "[n]o precise definition has been accorded the term 'scope of employment,'" broad criteria have been enunciated:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, * * *
>
> * * * * * *
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Pyne*, 543 N.E.2d at 1309 (quoting Restatement (Second) of Agency § 228 (1958)); *see also Shockley v. Svoboda*, 342 F.3d 736, 740 (7th Cir. 2003) (in Section 1983 case, court stated that an employee's act is not within the scope of employment if it is "too little actuated by a purpose to serve the master"). Facts related to the subjective intent of the employee are highly relevant to the scope of employment issue. *See Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996). *See also Dorsey v. Givens*, 209 F. Supp.2d 850, 853 (N.D. Ill. 2001).

For purposes of this motion, the City concedes that Mr. Thomas's conduct was of the kind he is employed to perform, and occurred within authorized space and time limits (Def.'s Mem. at 7 n. 7). The City argues that the undisputed material facts show that an indemnity claim nonetheless must fail, because Mr. Thomas's actions were not "actuated, at least in part, by a purpose to serve the master." To support this assertion, the City recites the testimony of Mr. Thomas indicating that he moved toward the front door of the nightclub to determine whether his brother was involved in

the disturbance (Def.'s Mem. at 8-9; Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 61-62), and that "[a]t no time did [Mr. Thomas] assist the security guards in removing the participants in the fight from the club" and "[h]e did not even attempt to break up the fight" (Def.'s Mem. at 9).

In making this argument, the City ignores Mr. Thomas's testimony that he went to the front door to help security restore the peace and to tell the fighting patrons to leave the nightclub (Def.'s 56.1 C. St., Ex. D, Thomas Dep. at 71). He also testified that he perceived himself as taking police action to stop the commission of a crime and that is why he shouted "police!" – "at least once" – into the general crowd as he approached. And, although he did not personally summon the police by calling 911 from his cell phone, as the City asserts, he testified that he directed his mother to do so (*Id.* at 46). This evidence is consistent with Mr. Thomas having an intent to advance the City's interest in seeing an altercation ended quickly. And, if that was his intent (at least in part), then that could be read as consistent with the admonition that even if off duty, an officer is expected to take "some action when he observes a crime being committed" (Def.'s 56.1 C. St. ¶ 60).

The City is correct that there are no facts indicating that Mr. Thomas was in uniform, arrested anyone, or investigated the fight beyond those facts which we have summarized above (Def.'s Mem. at 9). It is also undisputed that Mr. Thomas was off-duty at the time he and Mr. Coles interacted. However, these facts tell us nothing about Mr. Thomas's purpose when he moved toward the front door of the nightclub during the fight. Even if Mr. Thomas did not do all he might have done, the disputed facts could lead a jury to conclude that his actions were calculated – at least in part – to serve the City's interests.

Finally, we are aware that Mr. Thomas may have an interest in recalling his conduct in a way that brings him within the scope of his employment during the fight at the nightclub, so as to ensure

18

that if Mr. Coles were to obtain a compensatory damages judgment on the Section 1983 claim, that judgment would be paid out of the City's pocket and not Mr. Thomas's pocket. However, that potential interest goes to the credibility of Mr. Thomas's rendition of events, a matter that is for a jury to resolve at trial and not the Court to resolve on summary judgment.

## CONCLUSION

IT IS THEREFORE ORDERED that the defendant City of Chicago's motion for summary judgment (doc. # 60) on Count II of plaintiff's third amended complaint be DENIED. Defendant Maxine Thomas Jackson's motion to join co-defendant's motion (doc. # 61) on the limited issue of whether Mr. Thomas was shot is ALLOWED, but the substance of the motion, seeking summary judgment on that issue, is DENIED, for the same reasons stated in this opinion with respect to the City's motion.

A status conference is set for April 7, 2005 at 9:00 a.m. to discuss further proceedings in this case. Prior to that time, the parties are directed to seriously explore settlement.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 11, 2005